SVK

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jimmy Oram, | No.  CV-12-02450-PHX-FJM (BSB) |
| Plaintiff, | |
| vs. | **ORDER** |
| Mike Linderman, et al., | |
| Defendants. | |

Plaintiff Jimmy Oram, who is a prisoner in the custody of the Arizona Department of Corrections (ADC), brought this civil rights case pursuant to 42 U.S.C. § 1983 against Defendant Mike Linderman, Charles Manning, Wexford Health Services (Wexford), Dr. Thomas Bell, and Cameron Lewis, Facility Health Administrator (FHA).  (Doc. 41, Second Amend. Compl. (SAC).)  Plaintiff moves for summary judgment on the remaining claims—Counts I through III.  (Doc. 72.)  Defendants Linderman and Manning, who are Defendants in Counts I and II only, file a separate cross-motion for summary judgment.  (Doc. 99.)  This Order addresses Counts I and II.  Count III is addressed in a separate order.

I.    **Background**

In Count I, Plaintiff claims his First and Fourteenth Amendment rights and his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) are violated by Defendants Linderman and Manning's policy of allowing religious groups to meet on their own for no more than 60 minutes once per week.  Plaintiff claims that this

policy substantially burdens the practice of his religion because it does not allow him to complete his weekly prescribed observances.

In Count II, Plaintiff claims his First Amendment and RLUIPA rights were violated when Linderman and Manning denied Plaintiff's request for an adult-sized prayer shawl.

## II.    Governing Standards

### A.    Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a material factual.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

### B.    Religious Claims

"Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'"  *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)).  To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief."  *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994).  If the inmate makes his initial showing, he must establish that prison officials substantially burden the practice of his religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith.  *Shakur*, 514 F.3d at 884-85.

1    A regulation that burdens the First Amendment right to free exercise may be
2    upheld only if it is reasonably related to a legitimate penological interest.  *Turner v.*
3    *Safley*, 482 U.S. 78, 89 (1987).  This determination requires analysis of four factors:
4    (1) there must be a valid, rational connection between the regulation and the legitimate
5    governmental interest; (2) whether there are alternative means of exercising the right; (3)
6    the impact the accommodation of the right will have on guards, other inmates, and the
7    allocation of prison resources; and (4) the absence of ready alternatives.  *Id.* at 90.

8    The inmate bears the burden of establishing prima facie that RLUIPA has been
9    violated and that his religious exercise has been substantially burdened.  *Warsoldier*, 418
10   F.3d at 994.  The government then bears the burden of proving that the substantial burden
11   on the inmate's religious practice both furthers a compelling governmental interest and is
12   the least restrictive means of doing so.  *Id.* at 995 (citing 42 U.S.C. §§  2000cc-1(a),
13   2000cc-2(b)).

14                    **C.    Equal Protection**

15   The Equal Protection Clause requires that persons who are similarly situated be
16   treated alike.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985);
17   *Shakur*, 514 F.3d at 891.  An equal protection claim may be established by showing that
18   prison officials intentionally discriminated against a plaintiff based on his membership in
19   a protected class, *Comm. Concerning Cmty. Imp. v. City of Modesto*, 583 F.3d 690,
20   702–03 (9th Cir. 2009), or that similarly situated individuals were intentionally treated
21   differently without a rational relationship to a legitimate state purpose, *Engquist v. Or.*
22   *Dept. of Agric.*, 553 U.S. 591, 601–02 (2008).

23   In addition, an inmate "'must set forth specific facts showing that there is a
24   genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith
25   as compared to prisoners of other faiths" and that "officials intentionally acted in a
26   discriminatory manner."  *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997),
27   *abrogated on other grounds* by *Shakur*, 514 F.3d at 884-85.  Taking from *Turner*, the
28   Court must consider whether "the difference between the defendants' treatment of

1  [Plaintiff] and their treatment of [other] inmates is 'reasonably related to legitimate

2  penological interests.'" *Shakur*, 514 F.3d at 891.

3  **III.    Preliminary Issues**

4        **A.    No Damages under RLUIPA**

5        Damages are not available for official-capacity RLUIPA claims.  *Sossamon v.*

6  *Texas*, --- U.S. ---, 131 S. Ct. 1651, 1663 (2011).  In addition, this Court has consistently

7  held that damages are not available against Defendants sued in their individual capacity

8  under RLUIPA.  *See e.g., White v. Linderman*, CV 11-8152-PCT-RCB (SPL) (Doc. 68);

9  *Harris v. Schriro*, 652 F. Supp. 2d 1024, 1030 (D. Ariz. 2009); *Abdullah v. Schriro*, CV

10  08-0255-TUC-CKJ.  Although the Ninth Circuit has not ruled on the issue, it has

11  observed that four other circuit courts have held that RLUIPA does not provide for

12  damage claims against prison officials.  *Florer v. Congregation Pidyon Shevuyim*, 639

13  F.3d 916, 922 n. 3 (9th Cir. 2011).  Other district courts within this Circuit have also

14  found that RLUIPA does not provide for individual-capacity damage claims.  *See, e.g.,*

15  *Florer v. Bales- Johnson*, 752 F. Supp. 2d 1185, 1205-1206 (W.D. Wash. 2010); *Parks v.*

16  *Brooks*, 2010 WL 5186071, at *1-2 (D. Nev. 2010); *Sokolsky v. Voss*, 2010 WL 2991522,

17  at *2-4 (E.D. Cal. 2010) (damages are also not available on official-capacity claims).

18        Because damages under RLUIPA are not available as a matter of law, claims for

19  damages under RLUIPA are dismissed.

20        **B.    No Damages for First Amendment Official-Capacity Claims**

21        An action against a state official in his official capacity is not an action against the

22  official but rather is an action against the official's office, so damages are unavailable.

23  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Therefore, the Eleventh

24  Amendment bars damages actions against state officials in their official capacity.  *Flint v.*

25  *Dennison*, 488 F.3d 816, 824-25 (9th Cir. 2007).  Official-capacity damage claims for

26  First Amendment violations will be dismissed.

27  **IV.    Count I**

28        **A.    Background Facts**

1    Plaintiff asserts that he is a gentile practitioner of Torah Observant Messianic

2 Judaism (TOMJ).  (PSOF ¶ 6.)  He contends that one of the core tenets is observance of

3 the Sabbath (Shabbat), which begins on Friday at sunset and ends on Saturday at sunset.

4 (*Id*. ¶ 8.)  He claims that the Friday evening observance consists of about 25 prayers and

5 blessings and lasts 60-90 minutes and the Saturday morning observance involves prayers

6 and blessings, readings from the Bible, and discussion by the congregation, all of which

7 lasts up to 4 hours.  (*Id*.)  In his SAC, Plaintiff alleged that Shabbat also includes an

8 evening convocation known as Ma'arn.  (Doc. 41 at 5.)  Religious services for TOMJ are

9 currently limited to 60 minutes.  (*Id*. ¶ 19.)  Plaintiff argues that Native Americans are

10 permitted Sweat Lodge ceremonies that are 3 to 4 hours long because they cannot

11 complete the ceremony in only 60 minutes.  (PSOF ¶ 10.)

12    Defendants assert that ADC incarcerates over 40,000 prisoners in ten prison

13 complexes throughout Arizona, as well as in private and contracted facilities.  (DSOF ¶

14 52.) The current ADC inmate population represents over forty different religions as

15 declared by the inmates.  (*Id*. ¶ 55.)  Department Order (DO) 904: Inmate Religious

16 Activities/Marriage Requests governs inmate religious practice.  (*Id*. ¶ 54.)

17    The current policy for religious services provides that when no volunteer is

18 assisting or conducting services, services are scheduled for 60 minutes.  (*Id*. ¶ 74.)  The

19 60-minute time limit was established before Linderman and Manning became employed

20 by the ADC.  (*Id*. ¶ 75, Manning Decl. ¶ 17, Linderman Decl. ¶¶ 33, 48.) The Defendants

21 are not aware of the specific considerations that went into making the decision to limit

22 the time to an hour.  (Manning Decl. ¶ 17, Linderman Decl. ¶ 48.)

23    Multi-faith gatherings are generally held once a week at each institutional unit, as

24 arranged through the Chaplain in consultation with the Warden, Deputy Warden, or Chief

25 of security.  (DSOF ¶ 77.)  Multi-faith services are scheduled for 60 minutes. (*Id*. ¶ 8.)

26 Multi-faith gatherings are for religious groups that do not have identified volunteer

27 leadership, that are not already scheduled for weekly ceremonies, and that have a

28 sufficient number of inmates requesting group ceremonies.  (DSOF ¶ 78.)   Inmates

1  practicing a religion that does not have a volunteer are generally required to have their
2  services during the Multi-faith services.  (*Id.* ¶ 79.)  An exception is made for the Jewish
3  and Messianic Jewish inmates to observe Shabbat because Shabbat is observed on Friday
4  evenings. (*Id.*)

5      In his SAC, Plaintiff seeks 3 hours to conduct Shabbat services on Friday.  In a
6  grievance, he proposed a 1-hour Friday observance and 2 hours Saturday to study in the
7  dayroom.  (Doc. PSOF ¶¶ 15-17, Ex. 7 (Doc. 75-6).)  He further asserts that another
8  alternative would be to allow 90 minutes on Friday evenings and then use the prison
9  closed circuit television system to show Messianic Shabbat/Holiday studies that Plaintiff
10 and others can watch from their assigned living areas.  (Doc. 105 ¶ 99.)

11      **B.     Free Exercise Analysis**

12          **1.     Sincerely Held Belief and Substantial burden**

13     Defendants do not assert that Plaintiff does not have a sincerely held belief in
14 Shabbat services.  But Plaintiff must demonstrate that Defendants substantially burden
15 the practice of his religion by preventing him from participating in 3-hour Shabbat
16 services on Friday.  *Shakur*, 514 F.3d at 884-85.  The Court finds that Plaintiff has failed
17 to carry his burden.

18     RLUIPA does not define "substantial burden."  A substantial burden exists where
19 the state "put[s] substantial pressure on an adherent to modify his behavior and to violate
20 his beliefs."  *Thomas*, 450 U.S. at 717-18. Even where the compulsion to modify
21 behavior may be indirect, "the infringement upon free exercise is nonetheless
22 substantial." *Id.* at 718.  In *Warsoldier*, the inmate challenged a grooming policy that
23 forced him to choose between cutting his beard and being punished for violating the
24 grooming policy.   The Ninth Circuit held that "[b]ecause the grooming policy
25 intentionally puts significant pressure on inmates such as Warsoldier to abandon their
26 religious beliefs by cutting their hair, CDC's grooming policy imposes a substantial
27 burden on Warsoldier's religious practice." *Warsoldier*, 418 F.3d at 996.

28     In addition, a substantial burden exists where government conduct "impose[s] a

1   significantly great restriction or onus upon [religious] exercise." *Id.* at 995–96.  In other

2   words, "[t]he burden must be more than a mere inconvenience, and must prevent the

3   plaintiff from engaging in [religious] conduct or having a religious experience[.]"

4   *Navajo Nation v. United States Forest Serv.*, 479 F.3d 1024, 1033 (9th Cir. 2007).

5          The present case is distinguishable from *Warsoldier*—Plaintiff does not claim that

6   he is being threatened with disciplinary action or denied benefits.  And it is undisputed

7   that the ADC policy does not operate as an outright ban on congregate services for those

8   practicing TOMJ—they are permitted weekly 60-minute periods for observance on

9   Friday evening.  Thus, the issue is whether the time limitation restriction creates a

10  significantly great restriction or onus upon Plaintiff's religious practice, is more than a

11  mere inconvenience, and prevents Plaintiff from engaging in religious conduct or having

12  a religious experience.

13         Plaintiff alleges that those unable to perform the Friday evening and Saturday

14  morning observances in the manner described by him are deprived of the "rich spiritual

15  lessons and experiences" and "forced to violate God's commandments concerning

16  Shabbat" and that those "who do not observe Shabbat are spiritually cut off from the

17  commonwealth of Israel and the body of Yeshua."  (PSOF ¶ 9.)

18         But Plaintiff's SAC seeks 3 hours for services on Friday; he seeks nothing for

19  Saturday morning or Saturday evening.  Elsewhere, he suggests 1 hour on Friday and 2

20  hours on Saturday in the dayroom, or 90 minutes on Friday and access to the prison

21  closed circuit television system to show Messianic Shabbat/Holiday studies that Plaintiff

22  and others can watch from their assigned living areas.  Plaintiff's inconsistent positions

23  regarding what would be satisfactory undermine his claim that he is *substantially

24  burdened* by refusal to provide a 3-hour time period for services on Friday.  The 3-hour

25  period on Friday without any time on Saturday is itself inconsistent with his claim that he

26  must engage in certain activities on Saturday.  None of his alternatives seek 2 meetings

27  on Saturdays, which Plaintiff asserted in his SAC was a requirement of Shabbat.  And

28  one of his alternatives suggests 1 hour on Fridays, which is what the policy now provides.

1    Plaintiff's varying and inconsistent alternatives show that he is not so burdened by

2    denial of a 3-hour Shabbat service on Friday as to pressure him to abandon his beliefs,

3    and he is plainly not prevented from engaging in religious conduct or having a religious

4    experience, even as to Shabbat observances.  The policy providing for weekly 60-minute

5    services rather than 3-hour services is an inconvenience, not a substantial burden.

6    Finally, the Court need only consider the request for 3-hour Shabbat services on

7    Friday as that is the only request made in the SAC.  *See Pickern v. Pier 1 Imps., Inc.*, 457

8    F.3d 963, 968-69 (9th Cir. 2006).

9                            **3.    RLUIPA**

10    Alternatively, even if there is a triable issue of fact as to a substantial burden, the

11    Court finds that Defendants establish a compelling interest in denying 3-hour weekly

12    Shabbat services, that the present 60-minute time limitation is the least restrictive means

13    of meeting its compelling interest, and that no injunctive relief is available from either

14    Defendant.

15                        **a.    Evidentiary Objections**

16    Regarding population, security, and space issues, Defendants offer the declarations

17    of Chris Moody, currently the Warden at ASPC-Lewis, and Carson McWilliams, ADC

18    Northern Regions Operations Director.  (Doc. 100, Exs. 3, 5)  Plaintiff objects to many

19    assertions in these declarations, arguing that they are argument, hearsay, conclusions,

20    speculations and unsupported because Moody and McWilliams are administrators and do

21    not describe experience with security.  (Doc. 105 ¶¶ 93-97.)  Moody and McWilliams

22    submit supplemental declarations, and Plaintiff moves to strike them.  (Docs. 113, 114.)

23    The Court overrules Plaintiff's general objections to the declarations of Moody

24    and McWilliams; Plaintiff's assertion that administrators are not qualified to testify

25    regarding security is without merit as it relates to these declarants.  Although declarations

26    must be made with personal knowledge, a court can infer personal knowledge and

27    competence to testify from the declarations themselves.  *See Lockwood v. Wolf Corp.*,

28    629 F.2d 603, 611 (9th Cir. 1980); Fed. R. Civ. P. 56(e).

1    Here, Moody is an ADC Warden and former ADC Deputy Warden of Operations
2    and McWilliams is an ADC Division Director of Operations and a former ADC Warden.
3    The Court can infer from their positions their knowledge of security issues at ADC.  In
4    addition, the supplemental declarations make clear that these declarants have extensive
5    personal knowledge of ADC security matters.  Plaintiff's Motion to Strike is denied.

6                    **b.    Compelling Interest and Least Restrictive Means**

7    It is beyond dispute that security in a prison is a compelling government interest.
8    *Warsoldier*, 418 F.3d at 998.  Defendants' evidence also demonstrates that based on
9    security and space considerations, Defendants' 60-minute policy is the least restrictive
10   means of meeting compelling government interests.

11   Defendants contend that extending religious services to three hours without a
12   volunteer presents a significant security concern because it would either leave inmates
13   largely unsupervised for extended periods of time or require staff to be taken away from
14   their regular duties to supervise the inmates.  (DSOF ¶ 93, Moody at ¶ 6; McWilliams at
15   ¶ 6.)  A volunteer leading a service provides a degree of supervision.  (*Id*.)

16   As to the time allotted for Sweat Lodge ceremonies, Defendants acknowledge that
17   the ceremonies are conducted over a 3- to 4-hour period; but it is undisputed that the
18   inmates are only in the lodge for 15 to 20 minutes at a time before they are required to
19   take a break of 10 to 15 minutes before re-entering for 4 or 5 rounds.  (*Id.* ¶ 82, 102.)  In
20   addition, Sweat Lodge ceremonies are only conducted when there is wood available for
21   the inmates to use and when security considerations, such as staffing levels, allow.  The
22   last Sweat Lodge ceremony that was held at ASPC-Lewis was on October 24, 2013.  (*Id.*
23   ¶¶ 83, 85.)  When Native American inmates are not able to participate in a Sweat Lodge
24   ceremony, they are able to attend multi-faith services and participate in a Talking Circle
25   and are limited to 60-minute services.  (*Id.* ¶¶ 87-88.)

26   Defendants contend that the location of the Sweat Lodges versus other religious
27   ceremonies is relevant to both security and space issues.  The undisputed evidence shows
28   that Sweat Lodges have limited access as well as high visibility.  (DSOF ¶¶ 101-104;

PSOF2 ¶¶ 101-104.) They are located in separate, specifically designated locations. (DSOF ¶ 104, Moody Decl. ¶ 8, McWilliams Decl. ¶ 12.)  They are in areas where they are visible to staff on the unit at all times, and security staff is able to conduct checks of the area in the course of their regular duties.  (DSOF ¶ 103, Moody at ¶ 7; McWilliams at ¶ 11.)  Based on the forgoing, Defendants contend that it more difficult for inmates to smuggle weapons or other unauthorized items into Sweat Lodges. (DSOF ¶ 103.)

        In contrast, the rooms where Multi-faith gatherings are held are also used for other activities such as visitation and education; these rooms are accessible to a wider range of inmates and non-inmates on a much more frequent basis than the Sweat Lodges.  (DSOF ¶ 95.)  Therefore, these areas must be checked regularly; extending services would require additional checks.  Depending on the custody level, security staff will either have to be stationed there the entire time it is in use or will have to check it periodically. (DSOF ¶ 96, McWilliams Decl. ¶ 7.)

        Defendants assert that if religious services were extended to weekly, 3-hour services, with its current staffing levels, ASPC-Lewis would be unable to accommodate them.  (DSOF ¶ 99, Moody at ¶ 12.)  Moreover, Defendants contend, and Plaintiff does not dispute, that space is an issue because there are only so many areas in each given unit where religious ceremonies can be held.  (DSOF ¶ 100, McWilliams at ¶ 9; Moody at ¶ 9.)  The longer each religious service, the less space and time is available for other activities.  (DSOF ¶ 99, Moody at ¶ 12.)  There would also be significant scheduling conflicts due to the mixed use purpose of most of the rooms that would have to be used and increased security measures such as more frequent checks would have to be instituted and would strain the resources of the prison.  (*Id*.)

        The Court finds that Defendants have carried their burden to demonstrate compelling interests in limiting Shabbat services to 60-minutes on Friday evenings and that prison official considered other alternatives such as extending the services and using other spaces but that the current policy is the least restrictive means of furthering the compelling interests.

1              **4.    *Turner* First Amendment Analysis**

2              As noted, Plaintiff fails to show that the policy substantially burdens the practice

3    of his religion.  But even if it does, the policy is constitutional under the *Turner* test.

4                        **a.    Constitutional Violation**

5              The first *Turner* factor requires a valid, rational connection between the regulation

6    and the legitimate governmental interest.  *Turner*, 482 U.S. at 89.  The Court finds that

7    the ADC policy is rationally connected to a legitimate need to maintain secure and

8    orderly prison operations in a fiscally-responsible manner while at the same time

9    accommodating the needs of thousands of prisoners for religious services.  *Symington,*

10   197 F.3d 348, 355 (9th Cir. 1999) ("as long as it is plausible that prison officials believed

11   the policy would further a legitimate objective, the governmental defendant should

12   prevail on *Turner's* first prong").  The Court also finds that the different time limit for

13   Sweat Lodges is rationally connected to legitimate penolgical interests because inmates

14   must leave and return to Sweat Lodges over a period of time, few Sweat Lodges are

15   actually held, and Native American inmates are limited to the same 60-minutes for their

16   Talking Circles.

17             As to the second *Turner* factor—whether there are alternative means of exercising

18   the right that remain open to inmates, the relevant inquiry "is not whether the inmate has

19   an alternative means of engaging in a particular religious practice that he or she claims is

20   being affected; rather [the court is] to determine whether the inmate has been denied all

21   means of religious expression."  *Ward v. Walsh,* 1 F.3d 873, 877 (9th Cir. 1993).  The

22   lack of a 3-hour time period for Shabbat services has not denied Plaintiff all means of

23   religious expression; in fact, he is able to participate in weekly Shabbat observances.  He

24   can also possess printed religious material and pray and study on his own.  (DSOF ¶ 89.)

25             The Court finds that Defendants demonstrate that permitting 3-hour Shabbat

26   services would have a substantial burden on the prison due to staff resources needed for

27   security and due to space considerations.  The Court also finds that Plaintiff's SAC does

28   not pose a ready alternative to the policy.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b.      Qualified Immunity**

Even if Plaintiff can demonstrate a constitutional violation under *Turner*, the Court finds that Defendants are entitled to qualified immunity on the First Amendment damage claim.

Here, ADC policy provides for 60-minute religious services for all faith groups not led by a volunteer and who meet in a room not designated solely for that purpose. Plaintiff does not demonstrate a clearly-established right to longer services for his religious group, which meets in a space not designated solely for that purpose. Moreover, "[t]he qualified immunity standard gives ample room for mistaken judgments." *Dunn*, 621 F.3d at 1204-05.  The record establishes that the restriction on Shabbat services to 60 minutes was not made arbitrarily or irrationally.  *See Overton v. Bazzetta*, 539 U.S. 126, 137 (2003).

**C.      Equal Protection**

As noted, to show a violation under the Equal Protection Clause, a plaintiff must demonstrate that the defendant acted with a discriminatory intent or purpose that was based upon the plaintiff's membership in a protected class, *Serrano*, 345 F.3d at 1082, and he "'must set forth specific facts showing that there is a genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths" and that "officials intentionally acted in a discriminatory manner." *Freeman*, 125 F.3d at 737.

The equal protection claim relates to the additional time permitted for Sweat Lodge ceremonies.  Plaintiff fails to create a triable issue of fact regarding this claim. Prison officials are not required to provide identical facilities or services for different religious faiths; rather, they must make a good faith accommodation of rights in light of practical considerations.  *See Freeman*, 125 F. 2d at 737.  Plaintiff's reliance on *McReaken v. Schriro* is misplaced.  (Doc. 104 at 21-22, citing *McReaken*, 2011 WL 1988077 (D. Ariz. May 23, 2011).)  The district court in *McReaken* found there was no question that Native American Sweat Lodges were treated differently than other religious

1   services but also found the policy differences were reasonably related to legitimate

2   penological concerns. *McReaken*, at 2011 WL 1988077, *3-5.

3        Likewise, in the present case, the same *Turner* analysis that requires rejection of

4   the free-exercise claim, requires rejection of the equal protection claim.  The legitimate

5   interests of security and space justify the 60-minute limitation on Shabbat services.  In

6   addition, for the reasons discussed in the free exercise claim analysis, the Court finds that

7   Defendants are entitled to qualified immunity regarding damage claim for any violation

8   of equal protection.

9        **D.    Linderman and Manning**

10       The Court has already determined that Plaintiff cannot sue Defendants for

11   damages in their individual capacities.  His only claim is against each Defendant in his

12   official capacity for injunctive relief.   The evidence shows that security and space

13   concerns justify ADC's limitation on the time for group services and that these

14   Defendants have no authority to act with regard to these concerns such that they could

15   provide the relief sought.

16       Defendants claim they were not involved in decisions regarding the time-

17   restriction policies. (DSOF ¶ 67, Manning Decl. ¶ 11; Linderman Decl. ¶ 18.)  But the

18   issue here is not Defendants' personal responsibility for the alleged RLUIPA violation,

19   but whether their duties and responsibilities are such that, if Plaintiff prevails, they have

20   the authority to grant him relief.  *See Wolfe v. Strankman*, 392 F.3d 358, n. 12 (9th Cir

21   2004); *Sebra v. Neville*, 801 F.2d 1135, 1039 (9th Cir. 1986) (lack of authority to order

22   the requested transfer precludes the plaintiff from obtaining injunctive relief against the

23   defendant).

24       Plaintiff asserts that he and his fellow congregants "have asked security and the

25   chaplaincy for more time" for services and that "[s]ecurity had no objections, but left it

26   up to the chaplaincy." (PSOF ¶ 2.)  This is inadmissible hearsay because Plaintiff fails to

27   identify who "security" is.   The undisputed evidence shows that Linderman is the

28   Administrator of Pastoral Services.   The ADC policy regarding religious worship

provides that activities are based on several factors, including space and time considerations and safety and security issues.  (Doc. 100, Linderman Decl., Attach. C, DO 904.03 § 1.5.2.)  Defendants assert that Linderman does not have the authority to overrule decisions based on security consideration.  (DSOF ¶¶ 134-135.)  Plaintiff disputes this based on Linderman's general duty to make recommendations to the Division Director.  (PSOF ¶ 2.)  But even a duty to make recommendations would not give Linderman the authority to overrule decisions made on security.

As to Manning, Defendants argue that the claims appear to be based on Plaintiff's mistaken assumption that Manning is the "Division Director for Support Services" and his duties therefore include "approving or denying policies relative to religious practices and observances." (Doc. 99 at 18; ref. Doc. 73 ¶ 3.) In fact, Manning is the Program Systems Administrator and has never held the position or filled the role of Division Director.  (DSOF ¶¶ 48-49.)  Plaintiff provides no evidence that Manning has the authority to approve or deny policies related to religious practices. (DSOF ¶ 134; PSOF ¶ 134.)  That kind of policy change would have to be effected at the Director's level in conjunction with the Offender Operations Division. (*Id*.)  The Court overrules Plaintiff's objection based on hearsay.  (*See* PSOF2 ¶ 136.)

The Court has found that the evidence shows that the 60-minute limitation is a function of security and space issues and that there is no evidence that either Defendant has authority to change religious policy insofar as that policy is determined by security and space concerns.

In sum, the Court will deny Plaintiff's Motion for Summary Judgment as to the claims regarding the length of the Shabbat service and grant summary judgment to Defendants.

## V.    Count II

### A.    Background Facts

Plaintiff asserts that one of the core observances of TOMJ is the adorning of a shawl.  (PSOF ¶ 22.)  He contends that a shawl must be large enough to cover the head

and torso and have tassels 9″-10″ that extend below the waist.  Plaintiff seeks a shawl measuring 72″ by 22″, while the shawl authorized by ADC policy is 60″ by 20″.  (*Id.* ¶¶ 25; DSOF  ¶ 25.)

Plaintiff submitted an Inmate Grievance regarding the purchase of his shawl, claiming that the current size restriction of 60″ by 20″ was unrealistic, and that his family did an internet search and stated there was no such size available.  (DSOF ¶ 146.) Linderman responded and advised that Plaintiff could request a larger size through the purchase process based upon lack of availability, but that he had located smaller shawls through an internet search.  (DSOF ¶ 148.)  Linderman also advised that Christian Book Distributors, the same source that Plaintiff referred to as not having a smaller shawl, had one that was 63″ by 15″, and that while it exceeded the currently approved dimensions, it had a better chance of being approved than a 6-foot shawl.  (DSOF ¶ 150.)

Plaintiff appealed and the Director advised that shorter prayer shawls were available from a number of sources and provided a list of the sources. (DSOF ¶¶ 154, 156-157.))

In August 2012, Linderman received a letter from Plaintiff stating that he was unable to find a shawl that met the size requirements.  (DSOF 158)  Linderman advised that there were shawls available in the approved size and that they could be found under listings for children or youth.  (DSOF ¶ 159.)  A non-exhaustive search of the websites resulted in finding seven styles of shawls that come in sizes within the approved dimensions.  (DSOF ¶ 160.)  Rabbis from both Orthodox and Messianic Judaism have advised that there is no size restriction or requirement for a prayer shawl, and that any designation of "child-sized" or "youth" is a sales designation, not a religious designation. (DSOF ¶ 167.)

Defendants argue that the only complaint Plaintiff made with respect to the current size limitation on prayer shawls is that he was unable to find one within the approved dimensions.  (DSOF ¶¶ 142, 144, 146, 152, 154, 158, 161.)

**B.     Religious Claims Analysis**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    Sincerely Held Belief and Substantial Burden

As with the prior claim, the Court finds that Plaintiff fails to carry his burden that Defendants substantially burden the practice of his religion by limiting the size of the permissible shawl to 60″ by 20″ rather than 72″ by 22″.  *See Shakur*, 514 F.3d at 884-85.

It appears from Plaintiff's Motion for Summary Judgment that he is now claiming only that Defendants do not permit him to possess a larger shawl and that the 60″ by 20″ limitation is not valid.  (Doc. 72 at 8.)  He does not assert that he is unable to purchase a shawl within the required dimensions.[1]

Because the restriction on the size of the shawl does not result in imposition of a penalty, such as discipline or denial of benefits, *compare with Warsoldier*, 418 F.3d at 996, and it is undisputed that ADC does not impose an outright ban on possessing a shawl, *compare with Greene*, 513 F.3d at 988, the issue is whether the size limitation creates a significantly great restriction or onus upon Plaintiff's religious practice, is more than a mere inconvenience, or prevents Plaintiff from engaging in religious conduct or having a religious experience.

Plaintiff asserts that wearing the shawl is a core observance of TOMJ and that it must be large enough to cover the head and torso and have tassels 9″-10″ that extend below the waist.  But the policy permits Plaintiff to wear a shawl, and it is clear to the Court that a 60" shawl will cover the head and most if not all of the torso.  Although the

---

[1] Defendants are correct that Plaintiff did not actually assert in his initial grievance documents that the approved size is too small or complain that the approved size is for children. The Court has already determined, however, that Plaintiff exhausted his administrative remedies on this claim.  (Doc. 24.) Plaintiff initially complains only that 72″ by 22″ is the smallest he can find.  (Doc. 100, Ex. G, Inmate Letter dated 7/25/2011, Inmate Letter dated 8/15/2100, Inmate Grievance dated 8/25/2011 (Docs. 100-1 at 126, 123, 116).)   In his in Grievance Appeal, he complains that the shawl identified by Kingsland is for a bar mitzvah and not ceremonially appropriate for an adult and that another shawl does not have tassels; the final Grievance Appeal to the Director does not complain that the approved size is inappropriate.  (*Id*., Inmate Grievance Appeal dated 10/12/2011, Inmate Grievance Appeal dated 10/21/11(Docs. 100-1 at 114, 110).)

tassels may not extend below Plaintiff's waist, Plaintiff fails to explain how that will substantially burden the practice of his religion. As noted, Plaintiff's grievance documents complain only once about an inappropriate size; he never claims that the shawl must cover his head and torso and have fringe extending below his waist. Plaintiff's literature regarding the wearing of the shawl makes no reference to its size.

Plaintiff does not claim that he is unable to purchase a shawl within the approved size. The Court finds that the policy does not pressure Plaintiff to abandon his beliefs and he is not prevented from engaging in religious conduct or having a religious experience, including the wearing of a shawl. The size limitation is an inconvenience, not a substantial burden.

### 2. Qualified Immunity

The Court also finds that Defendants are entitled to qualified immunity as to the First Amendment damage claim regarding the size of the approved shawl. Plaintiff does not demonstrate a clearly-established right to a larger one, and even if there was a constitutional violation, "[t]he qualified immunity standard gives ample room for mistaken judgments." *Dunn*, 621 F.3d at 1204-05

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Summary Judgment (Doc. 72), Defendants Linderman and Manning's Motion for Summary Judgment (Doc. 99), and Plaintiff's Motion to Strike (Doc. 114).

(2)     Plaintiff's Motion for Summary Judgment (Doc. 72) on Counts I and II and Plaintiff's Motion to Strike (Doc. 114) are **denied**.

(3)     Defendants' Motion for Summary Judgment (Doc. 99) is **granted**, Counts I

…

…

…

…

…

1    and II are dismissed with prejudice, and Defendants Linderman and Manning are

2    dismissed.

3          Dated this 9th day of June, 2014.

4

5

6          *Frederick J. Martone*

7                Frederick J. Martone
                 Senior United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28